```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                     SOUTHERN DIVISION


JEANES-KEMP, LLC                                  PLAINTIFF

VS.                    CIVIL ACTION NO. 1:09-cv-723(DCB)(JMR)

JOHNSON CONTROLS, INC.                            DEFENDANT
```

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on the Amended Complaint for Declaratory Judgment, Removal of Clouds on Title and Damages filed by Jeanes-Kemp, LLC, and on the defendant Johnson Controls, Inc.'s Answer to the Amended Complaint.  The case was reassigned to the undersigned judge on August 18, 2011.  A Pretrial Order was filed on September 9, 2011, and a bench trial on the Amended Complaint and Answer, as further amended by the Pretrial Order, was held on September 19-21, 2011.  During the three day trial, the Court heard live testimony from nine witnesses and viewed excerpts from the videotaped deposition of Stephen Planchard.  By agreement of the parties, additional deposition testimony by Steven Christensen, Michael Lindsey, Henry Martinez, Hugh Nungusser, Don Ogden, Stephen Planchard and John Sposato, Sr., was received into evidence by the Court in lieu of live testimony.  Having considered the testimony, the pleadings, all matters presented at trial, and all matters subsequently submitted, the Court now makes its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a)(1).

## FINDINGS OF FACT

Jeanes-Kemp owned, in fee simple, a certain parcel of land located in Pass Christian, Mississippi. On July 16, 2007, Jeanes-Kemp conveyed the property to Harbor Town Development Group, LLC ("Harbor Town"). In securing the property, Harbor Town executed a promissory note for $2.72 million, the balance of the purchase price, in favor of Jeanes-Kemp. The note was secured by a first deed of trust held for the benefit of Jeanes-Kemp. The promissory note and deed of trust were recorded on August 8, 2007. The note and deed of trust required Harbor Town to pay the principal balance in 18 months and required interest to be paid on the outstanding principal every 90 days.

Harbor Town was owned by Stephen Planchard, Louie Negrotto, and David, Jerome and Michael Sachs. Harbor Town planned to develop the property as a planned community of town homes and retail spaces. Mr. Planchard and Mr. Negrotto had little experience in real estate development on this scale. The project contemplated six low-rise, multi-floor mixed-use buildings, including first floor retail shops and condominiums on the upper floors. Mr. Planchard had convinced the Sachs family, prominent New York real estate investors, to provide the financing since neither Planchard nor Negrotto had the requisite resources. The Sachs family insisted that Johnson Controls be brought in to act as

2

construction manager for the project.

On February 22, 2008, Johnson Controls entered into a contract with Harbor Town to serve as construction manager of the Harbor Town project.  Harbor Town and Johnson Controls then contracted with GM&R Construction Company, Inc., and Preferred Systems, Inc., to provide certain services and/or materials for the project.  GM&R was hired to perform foundation and structural steel work.  Preferred was to supply the steel.  As construction manager, Johnson Controls was responsible for overall supervision of the project, and stationed personnel on-site during construction.

After Harbor Town began construction of the development, the Sachs family backed out.  On October 17, 2008, Harbor Town provided notice to Johnson Controls that Harbor Town was exercising its right to immediately terminate for convenience its contract with Johnson Controls.  Harbor Town instructed Johnson Controls to cease all operations and to terminate all purchase orders and subcontracts for the project.  At the time construction stopped, foundation work had been completed and a substantial steel frame had been erected.

On October 22, 2008, GM&R filed a notice of construction lien on the property in the amount of $580,980.00.  Preferred Systems also filed a notice of construction lien, on November 18, 2008, in the amount of $457,854.79, for furnishing structural steel,

3

miscellaneous steel, roof and floor deck, anchor bolts, base plates, stairs and miscellaneous materials.

Harbor Town had also become delinquent in its payments to Jeanes-Kemp. In November of 2008, Jeanes-Kemp began foreclosure proceedings and set November 21, 2008, as the date of foreclosure sale, properly posting the foreclosure notice and publishing it in the local paper. However, Planchard and Negrotto convinced Jeanes-Kemp to postpone foreclosure while they attempted to acquire financing.

When Harbor Town instructed Johnson Controls to stop work on the project, Johnson Controls was owed $982,257.58 under the contract for its services. This amount had been invoiced to Harbor Town; however, as of the date of trial none of the money owed by Harbor Town had been paid. Johnson Controls' invoices were made up of five components: (1) Project Management, (2) Site Supervision, (3) Support, (4) General Conditions, and (5) Overhead and Profit on the amounts earned. These invoices were based upon the terms of Johnson Controls' contract with Harbor Town, which required Johnson Controls to provide general materials and equipment for support of the construction site. These included a trailer, internet access, dumpsters, portable bathroom facilities, utilities, and additional support for both the site and management of the project, all of which was invested at the beginning of the project. In addition,

4

Johnson Controls had one individual on the site full-time and two part-time. Although Johnson Controls' work was largely front-loaded, and it had expended considerable effort before the project even began, the payments were spaced evenly over the projected completion time of the project. In the event the project should take longer, there was no guarantee of additional compensation to Johnson Controls. In the event Harbor Town elected to terminate the contract for convenience and not cause, Johnson Controls was entitled to a contractual termination fee.

Johnson Controls verified the amount owed on its invoices, then turned the matter over to the Construction Services Group at NCS Credit, which holds itself out as "the construction credit industry's national leader in the filing and notices of liens in the U.S. and Canada." NCS advertised that its clients need only supply "basic project information," and NCS is responsible to "evaluate it, assess furnishing dates and retain legal counsel local to your project." In this case, NCS retained Alabama attorney Michael Lindsey on Johnson Controls' behalf. Mr. Lindsey received the information provided by Johnson Controls and determined that it was appropriate to prepare and file a lien in the amount of $982,257.58. Mr. Lindsey prepared and forwarded the lien to NCS for signing by Johnson Controls. Johnson Controls executed the lien on December 4, 2008. On December 18, 2008, the

5

lien was filed and recorded in the Construction Lien Book of the Chancery Clerk's Office, First Judicial District of Harrison County.

Harbor Town eventually secured some financing from Phoenix Financial Group, Inc.  As security for this funding, Phoenix received a deed of trust from Harbor Town in the amount of $750,000, which was filed as a second deed of trust and recorded with the Chancery Clerk's Office on March 2, 2009.

Harbor Town was unable to obtain other financing, and failed to make timely interest payments to Jeanes-Kemp.  On March 16, 2009, Jeanes-Kemp's counsel declared Harbor Town in default and demanded immediate payment of all principal and interest.  Jeanes-Kemp's counsel, Otis Johnson, Jr., commissioned a title examination of the property that apparently overlooked Johnson Controls' lien. As a result, Jeanes-Kemp failed to notify Johnson Controls of its intent to foreclose, although it did notify other lien-holders. Jeanes-Kemp duly published the Trustee's Notice of Sale announcing Jeanes-Kemp's intent to foreclose on the property and sell it on April 22, 2009.  At the sale, Jeanes-Kemp purchased the property for $1.8 million.  The trustee executed a Trustee's Deed in favor of Jeanes-Kemp.

On June 15, 2009, Jeanes-Kemp entered into a Contract of Purchase and Sale of the property with an entity named Harbor

Vieux, which was set up by Stephen Planchard, one of the owners of Harbor Town.  Mr. Planchard paid $27,720.00 from his own funds as earnest money.  The contract set a purchase price of $2.72 million, with $1.9 million to be paid at the closing on July 16, 2009.

On July 22, 2009, Harbor Vieux's attorney, Eric Wooten, sent a letter to Michael Lindsey, who had filed Johnson Controls' lien, asking Johnson Controls to release the lien.  On July 27, 2009, Amie LaBahn, counsel for Johnson Controls, responded to Mr. Wooten's letter and declined to execute a release, based on her experience in other jurisdictions that require actual notice to all lienholders for a foreclosure to be valid.  In response to Ms. LaBahn's letter, Otis Johnson, on behalf of Jeanes-Kemp, wrote to Ms. LaBahn and Mr. Lindsey on July 29, 2009, informing them that while it is customary to provide notice, Mississippi law does not require notice to junior lienholders for the foreclosure to be effective.  Otis Johnson again asked Johnson Controls to release its lien.  He stated that Jeanes-Kemp was attempting to sell the property, and that Johnson Controls' construction lien constituted a cloud on the title that could prevent a sale.  He informed Johnson Controls that, under Mississippi law, its lien was cut off as a result of the foreclosure.  He also stated that Jeanes-Kemp had suffered damages as a result of the lien, and that if Johnson Controls continued to claim a lien, "[i]t will be necessary for

7

Jeanes-Kemp, LLC, to institute suit to cancel any purported claim to a construction lien and seek actual and punitive damages together with all costs and attorney's fees."

On July 30, 2009, Rob Remington, another attorney for Johnson Controls, responded to Otis Johnson's letter, stating that his client did not understand Jeanes-Kemp's position that Johnson Controls' lien slandered Jeanes-Kemp's title: "If any claim to a lien was 'cut off' by the foreclosure (as your letter contends), then a release seems unnecessary at this time."  He also stated that he was willing to discuss the matter with Otis Johnson.

On September 10, 2009, Otis Johnson, on behalf of Jeanes-Kemp, wrote to Mr. Wooten, Harbor Vieux's counsel, stating that the purchase contract between Jeanes-Kemp and Harbor Vieux had terminated "as title objections could not be cured and resolved as therein called for."

On September 14, 2009, Jeanes-Kemp filed its Complaint for Declaratory Judgment, Removal of Clouds on Title and Damages in the Chancery Court of Harrison County, First Judicial District.  The Complaint sought the following relief as to Johnson Controls: (1) a judgment establishing that Johnson Controls' lien was terminated and extinguished by the foreclosure; (2) cancellation of Johnson Controls' lien as a cloud on the title of Jeanes-Kemp; (3) damages in the amount of $2,720,000, together with interest "from July 24,

2009, the date the closing of the sale to Harbor Vieux Development Group, LLC was to occur to the date of judgment together with all costs, expenses, and attorney's fees incurred by Jeanes-Kemp because of the loss of said sale"; (4) punitive damages, attorney's fees, costs, and general relief.  Following removal to this Court on the basis of federal diversity of citizenship jurisdiction, Johnson Controls filed an Answer on October 19,2009, admitting that it had filed and not released a construction lien, but denying any wrongdoing on its part.  It also asserted that it was not obligated to release a lien that had been extinguished through foreclosure.

The Complaint also included claims against Phoenix Financial Group, Inc., and Perre Cabell, Trustee.

On February 23, 2010, Johnson Controls filed a Motion for Judgment on the Pleadings.  In support of its motion, the defendant argued that the plaintiff's claims are based on an alleged loss of a sale of its property due to Johnson Controls' unwillingness to file a release of its construction lien, while as a matter of law Jeanes-Kemp's valid foreclosure of its first purchase money deed of trust would have automatically extinguished all junior liens, including the defendant's construction lien.  In the alternative, Johnson Controls moved for dismissal of Jeanes-Kemp's claims for punitive damages and attorney's fees, on the basis that the plaintiff cannot prove any malice by the defendant.

9

In response, Jeanes-Kemp contended that it "is entitled to have a judicial determination as to whether the foreclosure of the prior Deed of Trust cut off the construction lien and to have a cloud on its title removed."  In its brief, it maintained that "Jeanes-Kemp had the absolute right to bring this suit even though the [Johnson Controls] claim was void on its face as having been cut off by the foreclosure."  Jeanes-Kemp further asserted that although Johnson Controls' construction lien was extinguished by the foreclosure as a matter of law, Johnson Controls' attack on the validity of the foreclosure created a cloud on Jeanes-Kemp's title. In its rebuttal brief, Johnson Controls acknowledged that Jeanes-Kemp has the right to bring an action to quiet title, but not to seek compensatory or punitive damages.

On April 23, 2010, Chief Judge Louis Guirola, Jr., issued an Order denying Johnson Controls' Motion for Judgment on the Pleadings.  The Order noted that Johnson Controls acknowledges Jeanes-Kemp's right to bring an action to quiet title.  As for the plaintiff's claims for punitive damages and attorney's fees, the Court found that Mississippi allows a cause of action for "slander of title" against "'[o]ne who falsely and maliciously publishes matter which brings in question or disparages the title to property, thereby causing special damage to the owner'" (quoting Walley v. Hunt, 54 So.2d 393, 396 (Miss. 1951)), that such an

action can and should be brought at the same time as an action to quiet title, and that compensatory and punitive damages, as well as attorney's fees, are recoverable.

Although Jeanes-Kemp failed to expressly state in its Complaint that it was asserting a slander of title claim, the Court found that under Fed.R.Civ.P. 8(a) the plaintiff sufficiently pled facts that support and give notice of such a claim. Specifically, the Complaint alleges that Johnson Controls "'without justification, false[ly], malicious[ly], willful[ly], reckless[ly]' and with 'wanton disregard' claims a lien on the property, and that this false claim to a lien caused Jeanes-Kemp to lose the contracted-for sale of its property for $2,720,000." (quoting Complaint, ¶¶ XIII-XIV). Finally, the Court observed that "[w]hether Jeanes-Kemp will be able to prove its allegations is not pertinent to a motion for judgment on the pleadings."

On July 21, 2010, Jeanes-Kemp filed its First Amended Complaint. Among other things, the Amended Complaint adds an allegation that Johnson Controls' "wrongfully filing and/or maintaining [its] lien despite the fact that it was aware its alleged lien had been extinguished ... slanders the title of Jeanes-Kemp." The Amended Complaint also seeks compensatory and punitive damages allegedly resulting from slander of title.

As a result of amendments to Jeanes-Kemp's allegations and

11

claims, the Amended Complaint seeks the following relief as to Johnson Controls: (1) a judgment establishing that Johnson Controls' lien was not valid and/or was terminated and extinguished by the foreclosure; (2) cancellation of Johnson Controls' lien as a cloud on the title of Jeanes-Kemp; (3) damages in the amount of $2,720,000, together with interest "from July 24, 2009, the date of [sic] the closing of the sale to Harbor Vieux Development Group, LLC was to occur, to the date of judgment together with all costs, expenses, and attorney's fees incurred by Jeanes-Kemp because of the loss of said sale"; (4) judgment against Johnson Controls for prejudgment interest "from September 14, 2009, the date of filing of the original complaint, to the date of judgment with all costs, expenses, and attorney's fees incurred by Jeanes-Kemp because of the loss of said sale"; (5) judgment against Johnson Controls pursuant to Miss. Code Ann. § 85-7-201 in the amount of $982,287.58 for adversely affecting the rights of Jeanes-Kemp by filing and/or maintaining a false construction lien; (6) punitive damages, attorney's fees, costs, and general relief.

   The Amended Complaint also included claims against Phoenix Financial Group, Inc., and Perre Cabell, Trustee.

   On August 9, 2010, Johnson Controls filed its Answer to the Amended Complaint, again admitting that it had filed and not released a construction lien, but denying any wrongdoing on its

12

part, and asserting that it was not obligated to release a lien that had been extinguished through foreclosure.

Also on August 9, 2010, Johnson Controls filed a Motion to Dismiss for Lack of Standing. This motion challenges the plaintiff's standing to bring any claims against the defendant for slander of title and/or filing a false lien, with respect to the initial filing of the lien, based on the fact that Jeanes-Kemp was not the owner of the property at the time the lien was filed. In a response dated August 23, 2010, Jeanes-Kemp argues that it had standing in that it owned an interest in the property at the time Johnson Controls filed its construction lien. On November 1, 2010, Judge Guirola took the motion under advisement, and on March 24, 2011, the motion was denied without prejudice, with the issues raised therein to be decided at trial.

On November 15, 2010, an Order was entered dismissing defendant Perre Cabell in his capacity as trustee of the deed of trust in favor of Phoenix Financial Group.

On December 22, 2010, the plaintiff filed a Motion for Partial Summary Judgment, seeking a declaration that Johnson Controls' lien is a cloud on the plaintiff's title. Jeanes-Kemp's motion was based on its assertion that it holds "perfect title" to the property by virtue of its mortgage foreclosure, and that Johnson Controls' lien is invalid. Jeanes-Kemp also sought an order

13

requiring Johnson Controls to remove its lien from the construction lien records.   In a response dated January 7, 2011, Johnson Controls asserted that its lien was extinguished by Jeanes-Kemp's foreclosure and therefore was not a real impediment to transferring good title.   In addition, Johnson Controls contended that its lien was extinguished by operation of law, pursuant to the one year limitation period found at Miss. Code Ann. § 89-5-19 (after a period of one year from its filing, a lien "shall cease and have no effect").   In rebuttal, Jeanes-Kemp argued that it was entitled to have the lien removed as a cloud on title regardless of its impotence to do harm to Jeanes-Kemp's title.

On February 9, 2011, plaintiff Jeanes-Kemp and defendant Phoenix Financial Group reached a settlement.  On July 21, 2011, an Order was entered dismissing all claims against Phoenix Financial Group with prejudice.

On February 18, 2011, a Stipulated Order was entered.   The Order reflects that Johnson Controls agreed to execute a release of the lien "purely as an accommodation and courtesy to Jeanes-Kemp and without admitting any legal obligation ever to have done so." In addition, the Order states that it "shall not prevent Jeanes-Kemp from arguing that [Johnson Controls'] lien should have been released at an earlier time, and shall not prevent Jeanes-Kemp from presenting all of its claims with the understanding that [Johnson

14

Controls'] Release of its Lien shall not be considered an admission of liability." As a result of the Stipulated Order, Jeanes-Kemp's Motion for Partial Summary Judgment was rendered moot.

On February 8, 2011, Johnson Controls filed a Motion for Summary Judgment. In its motion, the defendant makes two arguments: (1) A valid foreclosure extinguishes junior liens as a matter of law; therefore, the junior lienholder is not obligated to take further action to release its lien of record; and (2) Jeanes-Kemp cannot prove the defendant's lien (as opposed to a lack of financing) caused the failure of the sale of the property to Harbor Vieux, and cannot prove that the defendant acted maliciously.

Jeanes-Kemp's response, filed February 21, 2011, argues that Johnson Controls' assertion of the validity of its lien following foreclosure constituted slander of title, and that Jeanes-Kemp had several witnesses prepared to testify that the Harbor Vieux sale failed as a result of Johnson Controls' lien. Specifically, the plaintiff cites John Sposato's deposition testimony that (1) he had the money to fund the sale, but chose not to do so because of both the Johnson Controls lien and a misrepresentation by one of Harbor Vieux's principals, and (2) that he would have bought the property directly from Jeanes-Kemp, outside of the Harbor Vieux deal, but for the lien.

In its rebuttal, filed March 7, 2011, Johnson Controls

15

reasserts its position that a junior lienholder, whose lien is extinguished following the foreclosure of a superior deed of trust, is not obligated to cancel its lien of record.  It also asserts that Jeanes-Kemp lacks standing and cannot otherwise show that it has a claim under Miss. Code Ann. § 85-7-201.  As for the slander of title claim, the defendant argues that the facts of this case do not demonstrate malice on its part.  Further, it asserts that discovery shows John Sposato did not have the money to fund the purchase of the property; therefore, the element of special damages, crucial to a claim for slander of title, is missing.

Johnson Controls filed an additional Motion for Partial Summary Judgment, on April 1, 2011, asserting that it did not file its lien "falsely and knowingly" in violation of Miss. Code Ann. § 85-7-201, and did not "falsely and maliciously" file the lien so as to constitute slander of title, relying in part on an advice of counsel defense.  In its response of April 15, 2011, Jeanes-Kemp challenges the defense on a number of grounds - first of all, that Johnson Controls did not act in good faith, and that it did not seek advice of counsel.  To the extent that any advice of counsel was received, Jeanes-Kemp argues that Johnson Controls did not fully disclose the relevant facts to its counsel, and that it did not reasonably rely on advice of counsel.  Jeanes-Kemp also points out that the ultimate issue is Johnson Controls' good faith, and

16

advice of counsel is but one factor a fact finder may consider in determining a defendant's state of mind.

On April 29, 2011, Jeanes-Kemp filed a Motion to Strike Defendant's Advice of Counsel Defense, and for Sanctions.   As grounds for its motion, the plaintiff claimed that Johnson Controls had failed to respond to discovery requests on the issue, or had belatedly responded, and had violated two court orders.   In its response of May 13, 2011, Johnson Controls contended that the plaintiff's motion was itself untimely, since it was not filed by the April 1, 2011, deadline.   The defendant also denied that it violated any court orders, and asserted that it provided all relevant material in discovery.

All motions not ruled on by the Court were explicitly or by implication carried to trial, with all issues raised therein to be decided either at trial or upon conclusion thereof

Additional findings of fact are made under the following section, as they become pertinent to the issues of law.

<u>CONCLUSIONS OF LAW</u>

As an initial matter, the Court finds that the plaintiff's claims to quiet title and to remove a cloud on title became moot upon the release of Johnson Controls' lien following the February 18, 2011, Stipulated Order.   This leaves the plaintiff's statutory claim for the filing of a false lien and common law claim for

17

slander of title.

Mississippi's false notice of lien statute provides:

Any person who shall falsely and knowingly file the notice mentioned in Section 85-7-197 without just cause shall forfeit to every party injured thereby the full amount for which such claim was filed, to be recovered in an action by any party so injured at any time within one (1) year from such filing; and any person whose rights may be adversely affected may apply, upon two (2) days' notice, to the chancery court or to the chancellor in vacation, or to the county court, if within its jurisdiction, to expunge; whereupon proceedings with reference thereto shall be forthwith had, and should it be found that the claim was improperly filed rectification shall at once be made thereof.

Miss. Code Ann. § 85-7-201. Mississippi's false notice of lien statute is a penal statute, "inasmuch as it 'makes a wrong-doer liable to the person wronged for a fixed sum without reference to the damage inflicted by the commission of the wrong....'" Manderson v. Ceco Corp., 587 F.Supp. 445, 336 (N.D. Miss. 1984)(quoting State ex rel. Rogers v. Newton, 3 So.2d 816, 818 (Miss. 1941)). "One seeking to recover under a penal statute must bring his case clearly within the statute's terms." Id. at 446-47 (citing W.T. Rawleigh Co. v. Hester, 200 So. 250, 253 (Miss. 1941); 70 C.J.S. Penalties § 15(e)(1)(1955)). Thus, the plaintiff must clearly prove that the defendant filed the construction lien "falsely, knowingly, and without just cause." Id. at 447. "Knowingly" in the context of a penal statute means "willfully" and "with a bad purpose, an evil purpose, without ground for believing

18

the act to be lawful."  Id.

As for the slander of title claim, "'[s]lander of title' is a phrase commonly employed to describe words or conduct which bring or tend to bring in question the right or title of another to particular property, as distinguished from the disparagement of the property itself."  Walley v. Hunt, 54 So.2d 393, 396 (Miss. 1951). "The slander may consist of a statement in writing, printing, or by word of mouth ...."  Id.  The "publication of false and malicious statements, disparaging of plaintiff's property or the title thereto, when followed, as a natural, reasonable and proximate result, by special damage to the owner, are actionable."  Id.  "The false statement may consist of an assertion that ... defendant has an interest in or lien upon the [plaintiff's] property."  Id. "Whatever be the statement, however, in order for it to form the basis of a right of action it must have been made, not only falsely, but maliciously."  Id.  "The malicious filing for record of an instrument which is known to be inoperative, and which disparages the title to land, is a false and malicious statement, for which the damages suffered may be recovered."  Id.  In Walley, the Mississippi Supreme Court provided three examples of slander of title claims:

> ... In Coffman v. Henderson, [9 Ala.App. 553, 63 So.
> 808], the court held that an action for damages for
> filing, or causing to be filed, a notice of lien upon

19

plaintiff's land and refusing to cancel the same is in
the nature of a suit for slander of title and is governed
by the rules applicable to such actions.  In the case of
<u>Greenlake Investment Company v. Swarthout</u>, 161 S.W.2d 697
(St. Louis Court of Appeals), the court held that a
petition alleging that the defendants recorded a false
and malicious statement that they had a lien against
plaintiff's real estate was good against general
demurrer, though special damages were not alleged and the
instrument filed by the defendants allegedly did not in
law amount to a lien.

In the case of <u>Kelly v. First State Bank</u>, 145 Minn.
331, 177 N.W. 347, 9 A.L.R. 929, the court held that the
utterance of false and malicious statements disparaging
the title to property in which one has an interest, if
the statements are untrue, and cause damage, constitute
slander of title; and that filing for record an
instrument known to be inoperative is a false statement
within the rule, and if done maliciously it is regarded
as slander of title.  In that case the court said, "It is
clear, however, that if a man does no more than file for
record an instrument which he has a right to file, he
commits no wrong."

<u>Id</u>. at 397.

Based on <u>Walley</u>, the Court finds that the elements of slander

of title are:

(1) That there was a false statement concerning the real

property owned by the plaintiff;

(2) That the false statement was published to others;

(3) That the false statement was published maliciously; and

(4) That publication of the false statement concerning title

to the property caused the plaintiff pecuniary loss in the form of

special damages.

Turning first to the statutory claim, the Court heard extensive testimony from Bruce Graham, a project manager with Johnson Controls, concerning the contract with Harbor Town, the work that went into the Harbor Town project, and the method of invoicing that Johnson Controls used pursuant to the contract. Mr. Graham also discussed the effect the termination for convenience by Harbor Town had on the amount owed Johnson Controls. He was involved in determining the outstanding invoices and the total amount due. Mr. Graham testified that the lien was based solely on the debt that was contracted for and owing from Harbor Town. He took the invoices to Shared Services, which includes members of Johnson Controls' legal department. After review by Shared Services, the matter was turned over to the Construction Services Group at NCS Credit. NCS retained Alabama attorney Michael Lindsey to review the invoices and file the lien. Johnson Controls signed the lien on December 4, 2008, and it was recorded on December 18, 2008. There was some discussion of whether Johnson Controls, as construction manager, did not fit the role of contractor and thus was not entitled to a lien. However, the evidence shows that Johnson Controls did in fact fill the role of contractor in a number of respects and did work that entitled it to a lien. Some of the items in the invoices seem inflated; however, the Court finds that the invoices conform to the terms of the contract

21

between Johnson Controls and Harbor Town.  As the Court previously found at the conclusion of Mr. Graham's testimony, the construction lien was properly filed.  Based on the evidence presented, the Court finds that the construction lien was filed "with just cause," and not with a bad or evil purpose.  The lien was filed only after review by Johnson Controls' legal team and by outside counsel.  As the court in <u>Manderson</u> observed:

> The statute obviously is intended to punish the malicious filing of a construction lien with no basis whatsoever. In the case at bar, [the lienholder] acted in good faith on the advice of counsel in attempting to protect his interests through the filing of a possible lien against the property in issue.  Any other statutory construction would place a claimant in the untenable position of being forced to choose between a forfeiture of his rights through non-filing or a lawsuit if such filing proved erroneous, no matter how honestly and sincerely done. The court declines to accept such a construction of this statute.

<u>Manderson</u>, 587 F.Supp. at 447.

The Court therefore finds that Johnson Controls is entitled to a judgment in its favor as to Jeanes-Kemp's statutory claim for the filing of a false lien.  Since the lien was not filed with a bad or evil purpose, but was instead filed "with just cause," in other words without malice, the Court also finds that Jeanes-Kemp cannot recover on its slander of title claim as to the initial filing of

the lien.[1]

The Court now turns to the slander of title claim regarding Johnson Controls' failure to release its lien. Jeanes Kemp foreclosed on the property through non-judicial foreclosure on April 22, 2009. Johnson Controls was not notified of the sale. On June 15, 2009, Jeanes-Kemp entered into a Contract of Purchase and Sale of the property with Harbor Vieux, which had been formed by Stephen Planchard, one of the owners of Harbor Town.

On July 22, 2009, Harbor Vieux's attorney, Eric Wooten, wrote to Michael Lindsey, the attorney who had filed Johnson Controls' lien, seeking a release of the lien. (Exhibit P-26). The letter was forwarded to Amie LaBahn, counsel for Johnson Controls, who declined to execute a release, based on her experience in other jurisdictions that require actual notice to all lienholders for a foreclosure to be valid. (Exhibit P-27: letter from Amie LaBahn to Eric Wooten, July 27, 2009).

In response to Ms. LaBahn's letter, Otis Johnson, on behalf of Jeanes-Kemp, wrote to Ms. LaBahn and Mr. Lindsey on July 29, 2009,

---

[1] Johnson Controls also raised the legal issues of whether Jeanes-Kemp had standing to pursue the statutory claim, and whether the statutory claim was time-barred by the one-year statute of limitations in Miss. Code Ann. § 85-7-201. Because it finds that Johnson Controls did not file the lien with a bad or evil purpose, or malice, the Court does not reach either of these legal issues.

informing them that while it is customary to provide notice, Mississippi law does not require notice to junior lienholders for the foreclosure to be effective.  (Exhibit P-30).  Otis Johnson again asked Johnson Controls to release its lien.  He stated that Jeanes-Kemp was attempting to sell the property, and that Johnson Controls' construction lien constituted a cloud on the title that could prevent a sale.  He informed Johnson Controls that, under Mississippi law, its lien was cut off as a result of the foreclosure.  He also stated that Jeanes-Kemp had suffered damages as a result of the lien, and that if Johnson Controls continued to claim a lien, "[i]t will be necessary for Jeanes-Kemp, LLC, to institute suit to cancel any purported claim to a construction lien and seek actual and punitive damages together with all costs and attorney's fees."  (Exhibit P-30).

On July 30, 2009, Rob Remington, another attorney for Johnson Controls, responded to Otis Johnson's letter, stating that his client did not understand Jeanes-Kemp's position that Johnson Controls' lien slandered Jeanes-Kemp's title: "If any claim to a lien was 'cut off' by the foreclosure (as your letter contends), then a release seems unnecessary at this time."  He also stated that he was willing to discuss the matter with Otis Johnson.  (Exhibit P-31).

Also, at some point after June 19, 2009, and in any event

before July 27, 2012, Johnson Controls had come into possession, through Bruce Graham, of a newspaper article published in the Pass Christian Gazebo Gazette, dated June 19-June 26-July 3 2009.  The article, titled "Harbor Town Has New 'Vieux,'" recounts Stephen Planchard's "acquisition" of the property under a new entity, Harbor Vieux, and his plans to "build on the footprint of the old Harbor Town," using the foundations already in place.  (Exhibit D-60).

The plaintiff objected to admission of the proffered newspaper article into evidence on the grounds that it is double hearsay. The evidence is not hearsay because the statements contained in the article were not offered to prove the truth of the matter asserted. See Jauch v. Corley, 830 F.2d 47, 52 (5th Cir. 1987); Kalma v. City of Socorro, Texas, 2008 WL 954165, *9 (W.D. Tex. March 17, 2008)(newspaper article admissible as non-hearsay when used to show the effect on the hearer); U.S. v. Martin, 897 F.2d 1368, 1371 (6th Cir. 1990)("The hearsay rule does not apply to statements offered merely to show that they were made or had some effect on the hearer.").  The plaintiff's claim for slander of title requires proof of malice, which in turn requires an inquiry into the defendant's subjective state of mind.  The statements in the newspaper article are therefore relevant to show the subjective state of mind of the defendant, and the article is admissible.  Mr.

Graham testified that after seeing the article he was highly suspicious of the developments concerning the sale by Jeanes-Kemp to Harbor Vieux, and Mr. Planchard's utilization of the work which had been done but for which Mr. Planchard's former company had not paid.

The Court also heard evidence concerning a Verified Petition to Perpetuate Testimony filed June 24, 2009, by GM&R Construction and Preferred Systems in the Chancery Court of Harrison County, seeking to take the depositions of Mr. Planchard and Mr. Negrotto, principals of Harbor Vieux. (Exhibit D-11). The Verified Petition was later amended to add another principal in Harbor Vieux, Richard Anthony. (Exhibit D-58). Although Johnson Controls did not know of the Verified Petition until after this lawsuit was filed, this evidence was offered by Johnson Controls to support the objective reasonableness of its reluctance to release its lien, given that GM&R and Preferred had similar concerns regarding the potential invalidity of the foreclosure.

Like Johnson Controls, GM&R and Preferred held liens on the property. Lee Watt, an attorney representing the petitioners, testified that he filed the Verified Petition because (1) his clients had not been paid by Harbor Town, (2) Jeanes-Kemp had foreclosed on the property through non-judicial foreclosure, "ostensibly wiping out those construction liens," and (3) Jeanes-

26

Kemp "turned right around and conveyed the property through a similar transaction ... to what we believe may be an alter ego of Harbor Town ... because it was owned by the same person, Mr. Planchard."

Paragraph 16 of the Verified Petition, titled "Fraudulent Transfer," states:

> GM&R and Preferred believe the foreclosure of the Property was precipitated by a plan to defraud them of their respective lawful rights to collect money owed them by Harbor Town.  GM&R and Preferred further believe that Harbor Vieux's plan to purchase the Property in its much-improved condition is a continuation of a plan to defraud them by preventing them from exercising their rights as construction and materialmen lienholders.

(Exhibit D-11, ¶ 16).

Mr. Watt testified that the purpose of the petition was to investigate and do due diligence prior to bringing any allegations of fraud.  Although Mr. Watt admitted that no depositions of Jeanes-Kemp were sought by the petition, he stated this was "simply because they were not my first line of fire."  He further stated:

> I did not know what I would learn from the deponents such as Mr. Planchard and whether he would provide testimony which indicated that this was something he simply did on his own, i.e. the rolling over into a new company, or whether he had discussed ahead of time with Mr. Kemp that that was going to be done.  I just didn't know.  So to be fair to the Kemp entity, they were a secondary line of target that would be vetted during the depositions of Mr. Planchard and the others.

The Court is not concerned with the truth or falsity of these

27

allegations.  Nor is notice to Johnson Controls an issue.  Johnson Controls admits that it did not learn of the Verified Petition until October 28, 2009, well after this lawsuit was filed.  The Court, however, finds the evidence admissible solely on the issue of the reasonableness of Johnson Controls' suspicions.  Since both GM&R and Preferred Systems, lienholders who stood in positions similar to that of Johnson Controls, formed similar suspicions independently of Johnson Controls, the Court finds that the evidence supports the good faith of Johnson Controls' suspicions.

The Court also notes that during Mr. Michalski's cross examination of Mr. Jeanes, the witness was questioned about conversations he had with Mr. Planchard regarding the possibility that Mr. Planchard might form a new entity and purchase the property after foreclosure.  Mr. Jeanes was asked if any such discussions took place before the foreclosure, and he said no.  Mr. Michalski then read from Mr. Jeanes' deposition testimony, in which the witness stated that he could not deny any such discussions took place before the foreclosure because he could not remember.  The witness was then shown an exhibit containing an email exchange, which was introduced into evidence.  (Exhibit D-43).  The first email was from Mr. Jeanes to Mr. Planchard, dated June 2, 2009.  It indicates that Mr. Jeanes was worried that Jon Wagner (apparently another potential buyer) "might seek an injunction or otherwise try

28

to impede the sale" to Mr. Planchard, and that Mr. Jeanes
recommended closing the sale as soon as possible. The response,
from Mr. Planchard to Mr. Jeanes and Mr. Kemp, is dated June 3,
2009, and states:

> I appreciate your thoughts and I have had a preliminary
> discussion with my attorney (Donald Rafferty). He feels
> that I don't have any exposure under the circumstances.
> If we all think about it - Jon is trying to do the exact
> same thing by offering to purchase the property from you.
> Jon owns a small percentage of Harbor Town and his
> exposure is relative to mine in moving forward with a
> purchase under a new company name. I am meeting with
> Donald this week to go over everything in great detail.
> It may be easiest if he feels I have any possible
> exposure that would impact the sale to simply keep my
> name off of things for now. I would appreciate your
> allowing me to get our final legal opinion on this
> matter. With that said - It is still our intent,
> regardless of Jon - to move forward as fast as possible.
>
> . . .
>
> Jon has called both me and Richard [Anthony] several
> times. I plan to speak with him today and get him to
> sign a release of any liability associated with a new
> purchase. There are several reasons why he would be
> agreeable to this which I can explain later. He has some
> exposure regarding his breech of contract with you guys
> as it related to me and the assistance I was offering Jon
> at the time. I will let you know how that turns out.

(Exhibit D-43).

The Court was presented no evidence of any discussions between
Jeanes-Kemp and Mr. Planchard prior to the foreclosure regarding a
subsequent sale to Mr. Planchard. However, their discussions
shortly after the foreclosure are further evidence of the

reasonableness and good faith of Johnson Controls' concerns and suspicions regarding Mr. Planchard's ownership in both Harbor Town and Harbor Vieux and possible involvement of Jeanes-Kemp relative to its foreclosure.

Mr. Watt, attorney for GM&R and Preferred, also testified about conversations he had with Eric Wooten, attorney for Harbor Vieux, concerning the release of GM&R and Preferred's liens. Mr. Watt took the position that since there was a foreclosure which extinguished all junior liens under Mississippi law, a further release by Mr. Watt's clients would not be necessary. He testified:

> My conversation with Mr. Wooten - there was more than one - two, maybe three - was to the effect of his complaining about the fact that GM&R and Preferred Systems had liens on the project. And he wanted to explore the release of those liens. And we bantered back and forth about rights and responsibilities and the effect of foreclosure as to whether it did or did not release those liens. But going to your question about anything that would have kept the sale from going through, Mr. - it was Mr. Wooten expressing to me verbally and in writing that he thought standing liens of GM&R and Preferred Systems could jeopardize the sale. And my response was there was the foreclosure. And it either wiped it out or it didn't. ... and I essentially told him he should take that up with Otis Johnson [Jeanes-Kemp's attorney] and file a suit to remove a cloud on title or do whatever he needed to do.

Again, the Court finds evidence of these other lienholders taking a position similar to that of Johnson Controls, which, in the Court's opinion, lends support to a finding that Johnson Controls'

30

refusal to release its lien was made in good faith.

John Underwood was proffered by the defendant as an expert in the field of real estate law, specifically as to foreclosure proceedings in Mississippi and the impact of such proceedings on junior liens.  The plaintiff did not object to the witness's qualifications as an expert, and the portions of his testimony cited below were received without objection.  The plaintiff did not present any expert testimony of its own on these issues.

Mr. Underwood has practiced real estate law for more than thirty-five years, with foreclosures being a significant portion of his practice.  He stated:

> As I understand it, the issue is whether or not the construction lien that was filed by Johnson Controls somehow imposed a cloud on the title that prevented a subsequent loan closing from going forward.  And my opinion in essence is that the construction lien was terminated as a lien since it was cut off by the foreclosure of the Jeanes-Kemp deed of trust which was a prior lien.

Asked if Johnson Controls would have been required to file a formal release of its lien in July of 2009, Mr. Underwood replied, "... there are no statutes that require it.  There is no case law that I'm aware of that requires such a release and there is no contract that would have required it.  So the answer is no."  He also testified that if he prepared a title report, the construction lien would not even be shown as an exception, and it would not have been

31

an impediment to issuing a title insurance policy.

Mr. Underwood later stated that a junior lien extinguished by a valid foreclosure would not constitute a cloud on title.  The Court asked Mr. Underwood if his opinion would change if the purchaser at the foreclosure sale requested a pre-foreclosure lienholder to release its lien and the lienholder refused.  He replied that it would not be unusual for a lienholder to refuse, because the lienholder "may have lost his in rem lien against the property, but he would still have certain in personam rights to try to recover, and he might not want to do anything to take away or detract from his ability absent the lien."  He also stated that a question could arise concerning the validity of the foreclosure, and the lienholder might be held to have waived his right to object to the foreclosure if he had voluntarily released his lien.

Johnson Controls has argued throughout these proceedings that Jeanes-Kemp's slander of title claim fails because, as a matter of Mississippi law, a junior lienholder has no legal obligation to file a release of lien after a valid foreclosure.  The court does not reach this issue, however, because the evidence shows that Johnson Controls lacked malice.  Mr. Underwood's testimony supports the reasonableness and good faith of the defendant's position in not cancelling its lien when requested to do so by the plaintiff.

For all the above reasons, the Court finds that Jeanes-Kemp

has failed to meet its burden of proving malice under its slander of title claim, and that judgment should therefore be rendered in favor of Johnson Controls.

The final element of a slander of title claim is that publication of a false statement concerning title to the property must cause the plaintiff pecuniary loss in the form of special damages. The Court alternatively holds that the plaintiff has failed to meet its burden of proving special damages caused by the defendant's conduct. In order to prove damages from a lost sale, the plaintiff must first prove the amount of money it would have received if not for a lost sale caused by the defendants conduct. The plaintiff must then prove the present value of the property in order to show that a decline in value has resulted in damages.

On June 16, 2009, Jeanes-Kemp and Harbor Vieux entered into a Contract of Purchase and Sale of the property which was to close on July 16, 2009, for a purchase price of $2.72 million. (Exhibit P-16). The contract called for the payment of $1.9 million at the closing, with the remaining $820,000 to be financed by the seller. Payment of $27,200 as earnest money was made by the buyer upon execution of the contract. The contract provided:

> The Earnest Money shall be deposited in Holder's trust
> account upon receipt. The earnest money is non-
> refundable under any circumstances except in the event
> Seller is unable to furnish title called for herein in
> which case the earnest money shall be refunded to

Purchaser.

(Exhibit P-16, ¶ 2).

> The title to be conveyed to Purchaser shall be a good and
> marketable title in fee simple, and one which a title
> insurance company qualified to do business in the State
> of Mississippi will insure at regular rates, subject to
> Permitted Exceptions and to any survey exception. Within
> fifteen (15) days following the date of this Contract,
> Purchaser will cause the title to the Property to be
> examined and title Certificate or commitment for title
> insurance issued.  A copy of the Title Certificate or
> Commitment shall be furnished to Seller together with a
> copy of each document listed as an exception to the title
> or which creates a lien on the property.  A copy of the
> most recent ad valorem tax receipt or receipts shall be
> furnished to the Seller.  If there are Title Exceptions
> which may be cured, Seller agrees to take reasonable
> steps to cause the Title Exceptions to be removed.  If
> Seller is unable to obtain removal of the Title
> Exceptions within thirty (30) days after receipt of a
> copy of the Title Certificate or Commitment for Title
> Insurance and related documents this Contract shall
> terminate.  If title curative work is necessary, Closing
> shall be extended for up to thirty (30) days from the
> date specified for Closing.

(Exhibit P-16, ¶ 7).

Jeanes-Kemp ultimately terminated the contract on September 10, 2009.  Mr. Jeanes testified that between July 16, 2009, and September 10, 2009, Mr. Planchard repeatedly assured him that Mr. Sposato would be sending the money, but no money ever arrived.  On September 10, 2009, Otis Johnson, on behalf of Jeanes-Kemp, wrote to Mr. Wooten, Harbor Vieux's counsel, stating that the purchase contract between Jeanes-Kemp and Harbor Vieux had terminated "as title objections could not be cured and resolved as therein called

34

for." (Exhibit P-35). During his testimony on cross examination, Mr. Jeanes admitted that prior to September 10, 2009, he never considered going to court to have the validity of Johnson Controls' lien determined.

Mr. Jeanes also testified that Mr. Planchard paid the $27,200 in earnest money from his own personal funds at the time the contract for sale was executed. Although Jeanes-Kemp claimed the closing was unable to take place because of title problems, Jeanes-Kemp did not return the earnest money to Harbor Vieux or Mr. Planchard on September 10, 2009. In fact, not until December of 2009, after this lawsuit was filed, did Jeanes-Kemp return any of the money to Harbor Vieux, and then it was only half, $13,600, drawn on a personal account on behalf of Jeanes-Kemp. Mr. Jeanes stated that he also paid Mr. Planchard $2,500 out of his own personal funds. While not dispositive, this evidence does support this Court's finding that title problems were not the reason the sale to Harbor Vieux did not take place.

Mr. Jeanes also testified about a proposed Amendment to Contract of Purchase and Sale which was drafted and signed by Mr. Planchard on July 15, 2009. This document (Exhibit D-33) extended the closing date to July 24, 2009, but it was never signed by Mr. Jeanes or Mr. Kemp. As consideration for the extension, the purchaser was to deposit an additional $100,000 as earnest money,

to be wire-transferred on or before July 16, 2009.  The proposed
amendment also provided:

> Purchaser has arranged for the loan of all or a
> portion of the Purchase Price set forth in the Contract.
> Purchaser agrees to cause its Lender to notify Jeanes-
> Kemp, LLC ... that Lender is obligated to loan the money
> for the purchase of the property subject to said
> Contract.

(Exhibit D-33, ¶ 4).  The $100,000 was to come from Mr. Sposato.
Mr. Jeanes testified that Mr. Sposato, on July 18, 2009, assured
him that he had the money.  When asked if he did not sign the
proposed Amendment because the $100,000 from Mr. Sposato never
showed, Mr. Jeanes answered no.  But when asked why he did not sign
it, he said he did not know.  When questioned about extending the
closing date, he replied, "I hardly see anything sinister in that.
When you're trying to close a deal, we would have waited until
December for nothing if we thought there was a reasonable chance of
getting the money."

    Mr. Planchard testified by deposition that he was counting on
Mr. Sposato to fund Harbor Vieux's acquisition of the property,
that Mr. Sposato was to fund the entire purchase price, and that
the only way the purchase was going to take place was if Mr.
Sposato provided the funding.  (Planchard Deposition of Sept. 13,
2010, pp. 25-26).  When asked if he could point to any document
where Mr. Sposato indicated an unwillingness to fund the

transaction because of a lien on the property, Mr. Planchard replied that he had an email, as well as phone conferences with Mr. Sposato, but he could not find the email. (Planchard Depo. of 9-13-10, p. 152).  Nor did Mr. Planchard provide any evidence of the phone conferences.

Neither Mr. Planchard nor Mr. Sposato appeared voluntarily at trial, and despite counsel's efforts, neither of them could be located for purposes of compelling their attendance at trial.  The parties therefore agreed to submit their depositions in lieu of live testimony.   The Court weighed the credibility of the witnesses, and gave their testimonies such weight as they deserved. Of particular importance in weighing Mr. Sposato's testimony was the fact that he has had several felony convictions based upon acts of dishonesty or false statements.

Mr. Sposato testified by deposition that his funding was to come from a bank in Liechtenstein, but he could not recall the name of the corporation that held the account.  He stated that he was an investor in the corporation and had authority to direct money from the account; however, he had no idea what portion of the account he had authority to withdraw.  Later, he stated that he had access to $4.5 million. (Sposato Deposition of Oct. 26, 2010, pp. 30-39). Still later, he testified that he only had the money to make an initial investment, and that he "would have probably had investors

come in." (Sposato Depo., p. 39).

Mr. Sposato testified that he had been told about the lien on the property, but he also stated that he had been lied to by Mr. Planchard concerning the number of units that had been sold or rented. (Sposato Depo., pp. 47, 94). He stated that even if there was no lien on the property, he would never have funded the purchase by Harbor Vieux. Nevertheless, he insisted that he probably would have purchased the property himself. (Sposato Depo., pp. 50-51, 94). When asked where the money would come from, he replied, "One of my companies," and mentioned $4.8 million in a Liechtenstein bank available at his discretion. (Sposato Depo., p. 74).

On July 12, 2011, Magistrate Judge Robert H. Walker entered an Order granting in part a motion for contempt filed by Johnson Controls. The defendant had served Mr. Sposato with a subpoena duces tecum seeking all financial records relating to his creditworthiness or ability to provide the $3,000,000 for the purchase of the property. During his deposition, Mr. Sposato had indicated that he had access to several million dollars in a bank account in Liechtenstein, and that he could provide a bank statement within a week as verification. He also testified that his attorney, Stephen Christensen, was holding $200,000 in escrow from Pegasus Investment to use as a down payment on the Harbor

38

Vieux purchase.  Mr. Christensen, however, testified that he did not hold any money in escrow for Mr. Sposato nor any of his entities during the relevant time period.  Johnson Controls filed two motions to compel discovery responses, both of which were granted by Magistrate Judge Walker, but Mr. Sposato did not fully comply with either of the orders.  In response to Johnson Controls' motion for contempt, Mr. Sposato replied "that he does not now, and has never had, personally, the funds to purchase the subject property," and asserted that Pegasus Investment, not John Sposato, was the entity engaged in negotiations for the purchase of the property.  Johnson Controls produced public records from the State of Louisiana showing that Mr. Sposato is the registered agent and only listed officer for Pegasus Investment.  Magistrate Judge Walker found that Mr. Sposato had been evasive, vague, and inconsistent in his discovery responses, and ordered him to either reply to the discovery requests or face contempt charges.

On July 25, 2011, Mr. Sposato provided an affidavit in which he states that neither he nor Pegasus Investment, nor any other corporate entity of which he had control, ever had the funds sufficient to purchase the plaintiff's property.  (docket entry 266, Exh. A).  At trial, during cross examination of Mr. Jeanes, the defendant sought to have the affidavit admitted into evidence.  The plaintiff objected on the basis that it is hearsay.  The Court

39

agrees with the plaintiff.   Mr. Sposato was not available to testify at trial under oath and was not subject to cross-examination; therefore, his affidavit shall not be admitted in evidence.

The plaintiff, however, has failed to meet its burden as to damages and causation.  Mr. Jeanes testified that he never saw any bank statements or other proof of Mr. Sposato's financial worth. Mr. Planchard, despite his assurances to Mr. Jeanes that Mr. Sposato would come up with the money, also did not have any proof that Mr. Sposato had any money.  Both Mr. Jeanes and Mr. Planchard testified that the only source of funding for the sale of the property was Mr. Sposato.   Finally, Mr. Sposato testified at his deposition that the reason he backed out of the deal was misrepresentations by Mr. Planchard.   The Court does not find credible Mr. Sposato's testimony that he had funding available. The Court also finds that even if Johnson Controls had cancelled its lien, the sale of the property, being dependent on funding from Mr. Sposato, would not have taken place.  Therefore, the plaintiff has failed to prove both damages and causation.

The Court finds that the plaintiff has failed to prove any of its claims, and final judgment shall therefore be entered for the defendant.   Accordingly,

IT IS HEREBY ORDERED that the defendant is entitled to a final

40

judgment in its favor, and a separate Final Judgment shall be entered of even date herewith;

FURTHER ORDERED that, based on rulings at trial and in this Memorandum Opinion and Order, the following motions are deemed to be moot:

Motion for summary judgment by Johnson Controls (docket entry 227);

Motion for partial summary judgment by Jeanes-Kemp (docket entry 229);

Motion to strike defendant's answer and advice of counsel defense, motion for sanctions for failure to comply with court's order by Jeanes-Kemp (docket entry 243);

Motion for leave to file supplemental memorandum in support of motion for summary judgment by Johnson Controls (docket entry 266);

Motion in limine to exclude evidence of reliance on advice of counsel defense by Jeanes-Kemp (docket entry 270);

Motion in limine re property valuation by Johnson Controls (docket entry 272);

Motion in limine re Sposato funding by Johnson Controls (docket entry 274);

Motion in limine re reference to other potential sales by Johnson Controls (docket entry 276);

Motion in limine re post 12-18-08 conduct by Johnson Controls

(docket entry 278).

    SO ORDERED, this the 23rd day of February, 2012.


                           /s/ David Bramlette
                           UNITED STATES DISTRICT JUDGE